IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHELLE HALL and DANNY HALL, §
Individually and as Next §
Friend of M.S.H., a Minor, §
§
    Plaintiffs, §
§
v. § CIVIL ACTION NO. H-12-3474
§
§
ROBERT EMERSON ROBINSON and §
HARRIS COUNTY, §
§
    Defendants. §

<u>MEMORANDUM AND ORDER</u>

    Pending is Defendant Harris County's Motion for Summary Judgment (Document No. 27). After carefully considering the motion, response, reply, and applicable law, the Court concludes for the following reasons that the motion should be granted.

I.   <u>Background</u>

    Plaintiffs Michelle Hall and Danny Hall, individually and as next friend of minor M.S.H. ("Plaintiffs"), bring this suit against Robert Emerson Robinson ("Robinson") and Harris County (the "County"), arising out of Robinson's rape of M.S.H., a minor, that occurred on May 23, 2012 while she was in the custody of the County.[1]

---

[1] Document No. 6 (1st Am. Cmplt.).

Robinson was employed by the Harris County Juvenile Probation Department (the "Department") as a Juvenile Supervision Officer ("JSO").[2]   He was assigned to the juvenile pre-adjudication facility known as the Harris County Juvenile Detention Center (the "Detention Center"), where M.S.H., a fifteen-year-old minor, was a detainee in the sole custody of the Department.[3]

M.S.H. was processed into the Detention Center on March 10, 2012,[4] and was housed on the fourth floor in one of the two units reserved exclusively for female detainees.[5]   Robinson worked on the fifth floor and was never assigned to work on the fourth floor during the 76 days that M.S.H. was at the Detention Center.[6]

Shortly after M.S.H. arrived, Robinson began making unaccompanied visits to her cell.[7]   Another employee at the Detention Center engaged or triggered a mechanism that controls and unlocks cell doors to enable a JSO, in this instance Robinson, to open M.S.H.'s cell door.[8]   Robinson visited her two to three times

---

[2] Document No. 27-10 at 8 of 16; Document No. 29 at 2-3.

[3] Document No. 27 at 2; Document No. 29, ex. 6 at 9.

[4] Document No. 29, ex. 15 at 4.

[5] Id., ex. 6 at 8.

[6] Id., ex. 6 at 9.

[7] Document No. 29, ex. 2 ¶ 3-2.

[8] Document No. 29, ex. 2 ¶ 4; id., ex. 5 at 49 of 69 to 50 of 69.

per week during her approximate 11 weeks at the Detention Center.[9]
Initially, he gave M.S.H. food and candy, and in later visits he
engaged in improper sexual conduct.[10]   M.S.H. states in her
affidavit that "[d]uring at least 3 of his visits to my cell, JSO
Robinson touched my breasts, buttocks, and/or vagina and would make
sexually explicit comments like, 'I want you to sit on my face' or
'I want to fuck you.'"[11]  Robinson would tell M.S.H. to undress or
ask her to touch his "private parts."[12]   Robinson would also
describe detailed sexual acts he wanted to engage in with M.S.H.,
including sexual activities with multiple partners.[13]   Robinson
wrote letters to M.S.H. that include sexually explicit content,[14]
and he promised M.S.H. that after she finished her sentence the two
of them could be in a relationship.[15]

Robinson's statutory rape of M.S.H. was committed on May 23,
2012, two days before she was transferred from the Detention Center
to State custody.[16]  Robinson opened M.S.H.'s cell door and began

---

[9] Id.

[10] Id., ex 2 ¶ 5.

[11] Id.

[12] Id.

[13] Id.

[14] Id., exs. 2a, 2b, 2c.

[15] Id., ex. 2 ¶ 5.

[16] Id., ex. 2 ¶ 4.

flirting with her.[17]   Robinson entered just inside the cell and ordered M.S.H. to get closer to the cell door.[18]   He then began touching her breasts, buttocks, and vagina with his right hand,[19] while holding the cell door open with his left hand so as not to allow the door to close and lock him inside the cell with M.S.H.[20] This visit lasted approximately thirty minutes, with the last five or ten minutes being after "lights out" in the cells, and culminated with him repeatedly penetrating M.S.H.'s vagina with his penis from behind her for approximately three minutes.[21]

It was not until a couple of months later that detention facility supervisory authorities learned that Robinson had engaged in improper conduct with M.S.H.[22]   The initial discovery was made on August 1, 2012, when JSO Ruthie Coleman-Lister found in

---

[17] Id., ex. 2 ¶ 10.  Plaintiffs' summary judgment evidence is that JSOs Arzelia Soniat, Allesandro Richardson, Cynthia Dipeolu, and Derrick Coon are seen at different times either in the hallway or in a room at the end of the hallway during the more than one-half hour of hallway surveillance videotape exhibited in the summary judgment evidence.  It appears that at least two of them saw Robinson when he was in the hallway holding the door open to M.S.H.'s cell.  Id., ex. 6 at 15.  The Internal Investigation Report states that it "appears that [Robinson] may have been asked to leave on two separate occasions. . ."  Id., ex. 8 at 1.

[18] Id., ex. 2 ¶ 10.

[19] Id.

[20] Id.

[21] Id., ex. 2 ¶ 11.

[22] Id., ex. 8 at 2.

4

Robinson's personal property and turned in an envelope with letters from M.S.H. to Robinson containing sexually explicit language.[23] Unit Supervisor Purvis Hunt brought the envelope to Superintendent Aaron Beasley,[24] and Beasley thereupon contacted the Houston Police Department and M.S.H.'s mother.[25]   The Department conducted an internal investigation, during which Robinson denied that the letters belonged to him, claimed that he was keeping the letters for his brother "Sonny,"[26] and that Coleman-Lister had stolen $200.00 from him that was with the letters.[27]   The Department's internal investigation concluded that Robinson had contacts with M.S.H. that "violated the TJJD code of ethics."[28]   Robinson later pled guilty to sexual assault of a child under seventeen years of age,[29] and was sentenced to fifteen years in prison.[30]

After the August 1, 2012 discovery of the sexually explicit letters in Robinson's possession, it was discovered that some other JSOs had been aware of some of Robinson's inappropriate conduct

---

[23]  Id.

[24]  Id.

[25]  Id.

[26]  Document No. 27-10 at 12 of 16.

[27]  Id.

[28]  Id.

[29]  Document No. 29, ex. 10.

[30]  Id.

preceding his rape of M.S.H.  JSO Sonya Ray reported that she had known of a possible relationship between Robinson and M.S.H. but had made no report of such.[31]  It was also learned that JSO Derrick Coon had delivered to M.S.H. a sexually explicit note from Robinson, and M.S.H. states in her affidavit that Coon said he wanted her to have sex with him instead of with Robinson.[32]  M.S.H. in her affidavit further states that she reported to JSO Jones, a female guard with whom M.S.H. says she had become friends, that Robinson "was touching me and coming on to me and insisting on having sex with me," but when JSO Jones asked whether M.S.H. planned to report the incidents, M.S.H. says she replied, "I didn't want to and JSO Jones said that was okay."[33]  There is no evidence that any of these JSO peers reported to a unit supervisor or other person in authority their suspicions or observations about Robinson's misconduct.

## II.   Legal Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Once the movant carries this

---

[31] Document No. 29-17 at 1 of 2.

[32] Document No. 27, ex. 2 ¶ 9.

[33] Id., ex. 2 ¶ 7.

burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record [. . .]; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Id. 56(c)(3).

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for

the nonmovant, then summary judgment is proper.  <u>Kelley v. Price-Macemon, Inc.</u>, 992 F.2d 1408, 1413 (5th Cir. 1993).  On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper."  <u>Id.</u>  Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial."  <u>Anderson</u>, 106 S. Ct. at 2513.

### III. <u>Analysis</u>

A.    <u>Section 1983 Claim</u>

The Civil Rights Act of 1866 creates a private right of action for redressing the violation of federal law by those acting under color of state law.  42 U.S.C. § 1983; <u>Migra v. Warren City Sch. Dist. Bd. of Educ.</u>, 104 S. Ct. 892, 896 (1984).  Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights conferred elsewhere. <u>Albright v. Oliver</u>, 114 S. Ct. 807, 811 (1994).

A municipality can be held liable under § 1983 only when the municipality itself causes a constitutional deprivation. *See* <u>City of Canton v. Harris</u>, 109 S. Ct. 1197, 1203 (1989); <u>Monell v. Dept. of Soc. Servs.</u>, 98 S. Ct. 2018, 2037-38 (1978).  This requires the execution of an official county policy or custom which results in the injury made the basis of the § 1983 claim.  <u>Monell</u>, 98 S. Ct.

at 2035-36.  Proof of municipal liability sufficient to satisfy Monell requires: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.  Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002).  A high standard of proof is required before a municipality can be held liable under § 1983.  *See* Snyder v. Trepagnier, 142 F.3d 791, 796 (5th Cir. 1998); *see also* Board of County Com'rs v. Brown, 117 S. Ct. 1382, 1394 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability [improperly] collapses into *respondeat superior* liability."); Canton, 109 S. Ct. at 1208 (O'Connor, J., concurring) (Section 1983 liability should not be imposed absent a showing of "a high degree of fault on the part of city officials").

For purposes of municipal liability, an official policy may be (1) a policy statement, ordinance, or regulation, or (2) "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy."  Piotrowski v. City of Houston, 237 F.3d 567, 579 (5th Cir. 2001) (quoting Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*)). "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be

conclusory; it must contain specific facts." <u>Spiller v. City of Texas City</u>, 130 F.3d 162, 167 (5th Cir. 1997).

In their First Amended Complaint, Plaintiffs allege that the County failed to train and supervise its Juvenile Probation Department employees; that the County did not have "adequate procedures" and at the same time, Juvenile Probation Department staff failed "to follow procedures," which allowed Robinson "to continue his predatory behavior"; that "the usual and customary practice of [the Harris County Juvenile Probation Department is] to allow male officers effectively unlimited and unsupervised access to the female detainees"; and that there were no procedures to allow detainees such as M.S.H. "to alert authorities about unlawful and predatory behavior without fear of retribution," all of which "allowed the statutory rape to occur" in violation of M.S.H.'s rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments.[34]

The uncontroverted summary judgment evidence is that Harris County's policymaker for the Harris County Juvenile Probation Department ("Juvenile Probation Department") is the Harris County Juvenile Board ("Juvenile Board").[35]   The Juvenile Board is comprised of the Harris County Judge and seven other judges.[36]   It is the Juvenile Board that governs and sets all procedures for the

---

[34] Document No. 6 ¶¶ 10-11, 13, 23.

[35] Document No. 27-5 ¶ 8.

[36] <u>Id.</u> ¶¶ 8, 19; TEX. HUM. RES. CODE ANN. § 152.1071.

Juvenile Probation Department, and all rules, policies, and procedures approved and adopted by the Juvenile Board are required to be followed by all employees of the Juvenile Probation Department.[37]   The daily operations of the Department are managed by an Executive Director, Chief Juvenile Probation Officer Tom Brooks, and various deputy directors and supervisors who oversee the Department's more than 1,200 employees.[38]   Among other things, the Juvenile Probation Department maintains the Detention Center in downtown Houston, where both male and female juvenile detainees are in various stages of adjudication by the Juvenile Courts of Harris County.[39]   This is where M.S.H. was temporarily detained for eleven weeks during her judicial proceedings.   The Detention Center has a superintendent, assistant superintendent, more than a couple dozen juvenile probation officers who serve either as unit supervisors or shift supervisors, and numerous juvenile supervision officers ("JSOs"), one of whom was Robinson.[40]

The uncontroverted summary judgment evidence establishes that the Juvenile Board had adopted and had in place numerous rules, policies, and procedures for the Juvenile Probation Department, including personnel at the Detention Center regarding their

---

[37] Document No. 27-5 ¶¶ 8, 19.

[38] Id. ¶ 8.

[39] Document No. 29 at 10.

[40] Id., ex. 16 at 6-9

treatment of juveniles in custody.[41]  Those policies include the Department's "zero tolerance policy regarding any incidents of sexual abuse"[42] and expressly prohibit staff members from using "their official position to secure privileges or advantages,"[43] state that staff shall not "maintain or give the appearance of maintaining an inappropriate relationship with a juvenile residing in a facility,"[44] and forbid a staff member from being "designated as a perpetrator in a Commission abuse, exploitation and neglect investigation" conducted under state authority.[45]  Plaintiffs do not criticize these and numerous other applicable policies mandated by the Juvenile Board.

Plaintiffs assert, however, that the County failed to train and supervise employees and the evidence "demonstrates a clear pattern of similar incidents and prior incidents in which Harris County's 'official' policies were deliberately disregarded by Harris County's employees and these actions permitted JSO Robinson to enter M.S. Hall's cell and sexually assault her."[46]

---

[41] *See* Document No. 27-8.

[42] Id. at 5 of 41.

[43] Id. at 34 of 41.

[44] Id.

[45] Id.

[46] Document No. 29 at 13-14.

12

To succeed on a claim for failure to supervise or train against either a municipality or an individual, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of [her] rights; and (3) the failure to train or supervise amounts to deliberate indifference." Lewis v. Pugh, 289 F. App'x 767, 771-72 (5th Cir. 2008); Smith v. Brenoettsy, 158 F.3d 908, 911-12 (5th Cir. 1998); Hinshaw v. Doffer, 785 F.2d 1260, 1263 (5th Cir. 1986). "Where a plaintiff fails to establish deliberate indifference, the court need not address the other two prongs of supervisor liability." Goodman v. Harris Cnty., 571 F.3d 388, 395 (5th Cir. 2009) (citations omitted). "Deliberate indifference requires a showing of more than negligence or even gross negligence." Estate of Davis v. City of North Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005). "Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference. The plaintiff must generally demonstrate at least a pattern of similar violations." Thompson v. Upshur County, 245 F.3d 447, 459 (5th Cir. 2001) (citations omitted).

Plaintiffs offer no evidence of failure by the County to supervise and train Robinson, and fail to controvert Defendants'

13

summary judgment evidence of the extensive training Robinson did in fact receive, including the following:  Robinson was trained in accordance with the Texas Juvenile Justice Department (TJJD) Standards.[47]  The Texas Juvenile Probation Commission certified Robinson as a Juvenile Detention Officer in 2006 after he had completed 40 hours of training that included such mandatory topics as Juvenile Rights, Safety and Security, Abuse, Exploitation and Neglect, and Code of Ethics; and the Commission renewed his certification as a Juvenile Supervision Officer in 2010 after he had completed 86.50 credit hours of training.  Robinson's 2010 recertification was valid through the time of his termination in August 2012.[48]  Robinson's records show that he was trained on Juvenile Rights on seven separate occasions during the course of his five plus years of employment.[49]  His training records show that Robinson was presented and signed a copy of the Code of Ethics, which includes a prohibition against employees "maintain[ing] an inappropriate relationship with juveniles assigned to their caseload, supervised by the juvenile probation department, or coming under the supervision of the juvenile court."[50]  Robinson's training records also show that he completed the Juvenile Detention

---

[47] Document No. 27-5 at 3-4.

[48] Id. at 4.

[49] Document 27-7 at 1 of 23 to 3 of 23.

[50] Id. at 19 of 23.

14

Center Policy and Procedure Review, including a review of Juvenile Rights on October 19, 2011, only six months before he began his reprehensible cultivation of M.S.H. that culminated in his rape of this minor.[51]

Likewise, Plaintiffs have not presented summary judgment evidence of any "persistent, widespread practice of . . . employees," Webster, 735 F.2d at 841, or of a "pattern of similar violations," Thompson, 245 F.3d at 459, from which it can be inferred that Detention Center supervisors or the County's policymakers were deliberately indifferent to the training and supervision of JSOs regarding juvenile rights, inappropriate relationships with juveniles under supervision, and the County's zero tolerance for sexual abuse of detainees. "The Fifth Circuit requires more than a list of instances of misconduct to ensure that the jury has the necessary context to glean a pattern, if any." Alfaro v. City of Houston, No. H-11-1541, 2013 WL 3457060, at *13 (S.D. Tex. July 9, 2013) (Rosenthal, J.) (citing Peterson v. City of Ft. Worth, 588 F.3d 838, 851 (5th Cir. 2009)).

Plaintiffs' summary judgment evidence here is that out of seventeen documented complaints of abuse of juveniles over a period of five years preceding the rape,[52] only two involved sexual abuse,

---

[51] Id. at 21 of 23 to 23 of 23.

[52] Document No. 29 at 16; id., ex. 6 at 12.

15

and one of those was "youth on youth."[53]  Thus, the summary judgment
evidence establishes only one prior instance of sexual abuse having
been alleged against a Juvenile Supervision Officer during the five
years before Robinson assaulted M.S.H.  The fact that one JSO had
been accused of sexual abuse in the five years prior to Robinson's
rape of M.S.H. is not proof of a pattern or widespread practice of
JSOs having improper relationships with or committing sexual abuse
of detainees within the Detention Center.   It follows that
Plaintiffs have failed to raise a genuine issue of material fact
that the County or the Juvenile Board was deliberately indifferent
to the proper training and supervision of JSOs employed in the
Detention Center during Robinson's employment and prior to the
commission of his crime against M.S.H.  Defendant Harris County is
entitled to summary judgment on Plaintiffs' § 1983 claims.[54]

---

[53] Id., ex. 6 at 12.

[54] Plaintiffs offered no summary judgment evidence to support
and have therefore abandoned their remaining claim that the County
had no procedure for detainees to alert authorities to "unlawful
and predatory behavior," nor do Plaintiffs offer evidence to
controvert Defendant's documentary evidence of a "youth Grievance
Process."   In fact, included in Plaintiffs' own proof are two
"Juvenile Grievance Forms," both filled in by separate detainees
during the eleven weeks that M.S.H. was a detainee, expressing
certain complaints about two different staff members.  Id., exs.
3, 4.  The summary judgment evidence is uncontroverted that M.S.H.
had an effective grievance procedure available to her, and chose
not to use it.  See Document 29.

16

B.   State Law Claims

Plaintiffs allege assault and battery, and intentional infliction of emotional distress against Robinson, but not against the County, which is immune from liability for the intentional torts of its employee.[55]   The claims against Robinson in his official capacity were dismissed by Order signed July 29, 2013. The tort claims against Robinson in his personal capacity remain, but the case file reflects no return of service to establish that Plaintiffs served Robinson with summons and a copy of the Amended Complaint.[56]  The action against Robinson is therefore susceptible to being dismissed without prejudice.  See FED. R. CIV. P. 4(m).

IV.   Order

For the foregoing reasons, it is

ORDERED that Defendant Harris County's Motion for Summary Judgment (Document No. 27) is GRANTED, and Plaintiffs Michelle Hall's and Danny Hall's, Individually and as Next Friend of Minor

---

[55] TEX. CIV. PRAC. & REM. CODE ANN. § 101.057 (West 2011).

[56] Plaintiffs did serve Robinson with summons and a copy of their Original Complaint on December 3, 2012 (Document No. 3). Before Robinson's answer was due, however, Plaintiffs superseded their Original Complaint by filing their First Amended Complaint on December 19, 2012.  There is no evidence that Plaintiffs requested the Clerk to issue a summons or ever served Robinson with their First Amended Complaint.  After filing their Amended Complaint, Plaintiffs evidently ceased their efforts to prosecute any claims against Robinson, which claims in any event may now be time-barred.

M.S.H., claims against Harris County are DISMISSED with prejudice. It is further

ORDERED that Plaintiffs, within seven (7) days after the entry of this Order, shall file a response to show cause, if any exists, why Plaintiffs' remaining claims against Defendant Robert Emerson Robinson should not be dismissed without prejudice for want of prosecution. If Plaintiffs choose not to file a response, Plaintiffs' claims against Robinson will be dismissed without prejudice in the Court's Final Judgment.

The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas, on this _10 TH_ day of October, 2014.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE